[Civ. No. 9918. First Appellate District, Division One.—September 2, 1936.]

VESTA CLEVELAND, Appellant, v. ESTATE OF WILLIAM A. EDWARDS, Deceased, Respondent.

Wayne R. Millington for Appellant.

Long & Levit for Respondent.

KNIGHT, J.—Plaintiff is a niece of William A. Edwards, deceased, and the administratrix of his estate. She pre-

sented a claim against the estate for $5,000 alleged to be due for personal services rendered the decedent during the fifteen months immediately preceding his death, and the probate court rejected the claim. Thereupon she brought this action to collect it, and the trial court gave judgment for the estate, from which plaintiff appeals, urging as sole ground for reversal insufficiency of the evidence to sustain the trial court's findings.

The decedent died June 5, 1933. He was a widower, and his next of kin were a brother, two nieces (one of whom is the plaintiff), and several nephews and grand-nephews. His estate consisted of $41,255.35 in bank deposits, a two-flat dwelling on Masonic Avenue in San Francisco of the appraised value of $5,000, and an automobile and household furniture of small value. He had been failing in health for some time as the result of heart trouble and lived alone in the upper flat of his property on Masonic Avenue. During the latter part of the year 1931 a tenant occupying the lower flat wrote to plaintiff, who was then living in Los Angeles, stating that her uncle's condition was growing gradually worse, and suggesting that she come to San Francisco and look after him. In January, 1932, plaintiff arrived at her uncle's home, and she continued to live there up to the time of his death, during which period she performed the household duties, waited on her uncle, drove him about in his automobile, and transacted some of his business.

She averred in her claim and alleged in her complaint in substance that she took up her abode with her uncle and performed the services mentioned at his special instance and request, in consideration of which he promised orally to convey to her his home on Masonic Avenue, which he failed to do, and that consequently she was entitled to compensation equal in amount to the value of the property he promised to convey. (*Estate of Towne*, 143 Cal. 507 [77 Pac. 446].) In behalf of the estate it was claimed that plaintiff took up her residence with her uncle because she was destitute and much in need of a place to live, and with the understanding that she was to receive no compensation for her services other than being maintained and provided with a home.

The evidence adduced by the respective parties is sufficiently conflicting, in our opinion, to preclude any

interference with the conclusions reached thereon by the trial court. In this regard the record discloses that plaintiff sought to establish her case by evidence of the declarations and statements made by the decedent to others, both before and after plaintiff began living in his home. One witness, Tillie Swasey, testified that in 1931 the decedent asked her if she thought the plaintiff would come and live with him if he paid her a salary and gave her the house at the time of his death; and that later he told her that he had made arrangements for plaintiff to come. Another witness, the proprietor of a magazine shop and a friend of the decedent of eleven years' standing, testified that decedent told him prior to January, 1932, that he intended sending for his niece to take care of him, and that he intended to give her his house in return for her services. And a Mrs. Eldridge, with whom plaintiff had been engaged in business in Los Angeles in operating apartment houses, testified that in September, 1931, the decedent told her he would like to have his niece come and live with him and take care of him; that in March, 1932, she visited plaintiff and the decedent at the latter's home in San Francisco for a few days, at which time he stated to her that he intended to give plaintiff his house to compensate for her services, and that later, when he received certain moneys from his sister's estate, he intended to give her a cash salary as well. She further testified that commencing in December, 1932, she again visited them in San Francisco for three months, during which time the decedent reiterated his intention to give plaintiff the house as compensation for her services, stating that he wanted to deed it so that title would pass at the time of his death rather than leaving it to her by will. A nephew of the decedent, who was called as a witness on behalf of the estate, testified that his uncle once said to him in plaintiff's presence that plaintiff was "not staying at no charge"; that she was "receiving a certain amount", to which plaintiff replied, "Well, of course, I am using some of that money to buy things, as there is no money in the house at this time."

On the other hand, the estate introduced evidence showing beyond much doubt that when plaintiff took up her abode with her uncle she was, as claimed by the estate, practically penniless and without a place to live. In this connection

it was shown that at the close of the year 1931 the apartment house business in which plaintiff was engaged in Los Angeles with Mrs. Eldridge ended disastrously as a result of the depression, and that they were being harassed and sued by creditors. The furniture they had purchased on instalment payments had been repossessed by the seller, a chattel mortgage on other property was being foreclosed, and eventually, on December 31, 1931, which was only a few days prior to plaintiff's arrival at her uncle's home, she had been evicted from the premises which she and Mrs. Eldridge had been occupying as a home; that subsequently in June, 1932, while testifying in supplemental proceedings growing out of the entry of a deficiency judgment in foreclosure proceedings, plaintiff stated that she had been "broke" for two years; and in November, 1932, she went into voluntary bankruptcy, listing debts in the sum of $121,245.26, with no assets except a few articles of exempt household furniture. And in apparent contradiction of plaintiff's claim that the decedent promised to convey the Masonic Avenue property to her, the estate proved that shortly before the decedent died, plaintiff, at the decedent's request, called at the decedent's bank and gave the bank oral instructions as to the preparation of decedent's will; that such a will was prepared, but it arrived at his home through the mail on the day he died, too late for him to execute; and in that will no mention is made of the Masonic Avenue property; under its terms the entire estate was to be divided in certain shares among the next of kin including plaintiff. Moreover, it was shown that in August, 1933, some two months after decedent's death, plaintiff wrote a letter to one of her cousins indicating her desire to purchase the property, and saying nothing about her claim of a broken oral promise to convey the property to her. In part she said "I have been trying to see what we can do with this Masonic Ave. flat. Have listed it around and been inquiring about to see what we might hope to get for it. The inheritance tax appraisal was $5,000.00 (for tax purposes—but it seems I cannot expect to get that much—according to local real estate men . . . we cannot expect to get more than 35 or $3700.00. . . . I thought I would like to buy it if we had to sell for that price—if I can get my father to give me his share and you & Charlie—Cletus etc. would be willing

to sell me your share.'' Then again, as opposed to plaintiff's claim that she was to be compensated for her services, the estate introduced in evidence the inventory filed in the matter of the estate, sworn to by plaintiff, wherein she declared that the "only debts against the estate are cost and expenses of administration herein, funeral expenses and unpaid current accounts". And it was also shown that in giving her testimony in the supplemental proceeding already referred to she stated in substance in answer to an inquiry as to her earnings that she was just being taken care of by ·her uncle, that she was making no money—just enough for an existence; that she was merely being given a home and that she did not want to lose it because if she did she did not know what she would do to get along in the future. Other circumstances of lesser importance were shown in support of the estate's contention, but the above is sufficient to demonstrate that the trial court's findings are based on conflicting evidence.

As frequently stated, in determining the question of the sufficiency of the evidence the power of the reviewing court begins and ends with the inquiry of whether there is substantial evidence, contradicted or uncontradicted, which in and of itself will support the conclusion reached by the trial court. If on any material point the testimony is in conflict, it must be assumed that the conflict was resolved in favor of the prevailing party (*Trowbridge* v. *Briggs,* 140 Cal. App. 554 [35 Pac. (2d) 426]), and the case will be accepted as proved by the prevailing party, all evidence adduced by the losing party in conflict therewith being rejected. (*Bank of Italy* v. *Cadenasso,* 206 Cal. 428 [270 Pac. 931, 274 Pac. 536].) Or if the evidence is not conflicting but open to two inferences, one of which will support the trial court's findings, the reviewing court is precluded by such finding even though from the same evidence it might have drawn the other inference. (*Gallick* v. *Castiglione,* 2 Cal. App. (2d) 716 [38 Pac. (2d) 858].) Even assuming, therefore, that in the present case the evidence would have supported a decision in favor of plaintiff, it is likewise legally sufficient to sustain a decision in favor of the defendant; and in that state of the record the judgment must be affirmed. It is so ordered.

Tyler, P. J., and Cashin, J., concurred.